UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

APR 2 6 2016

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| CHRISTOPHER FORD, et al., | ) |
| | ) |
| Defendants. | ) |

Criminal No. 15-0025 (PLF)

OPINION

This matter is before the Court on the motions of defendants Marcus Fenwick,

Christopher Ford, and Theodore Sanders to suppress wiretap evidence and the motion of

defendant Ford to dismiss Count One of the indictment on the basis of the government's alleged

outrageous conduct.  Defendants Levon Simmons, Anthony Hager, Andre Leach, and Rashard

Grant adopt one or more of the motions.[1]  The government opposes the motions.  Upon

consideration of the parties' written submissions, the oral arguments presented at the pretrial

motions hearing held on December 11 and 16, 2015, supplemental memoranda filed by some of

the defendants and the government, the relevant case law, and the entire record in this case, the

Court will deny the motions.[2]

---

[1]     After defendants filed their motions, Fenwick, Leach, and Grant entered guilty
pleas, mooting their requests for relief.  See infra at notes 3, 5-7.

[2]     Relevant papers reviewed by the Court include:  Superseding Indictment [Dkt.
40]; Government's Bill of Particulars [Dkt. 75]; Defendant Fenwick's Motion to Suppress
Wiretap Evidence ("Fenwick Mot.") [Dkt. 101]; March 7, 2014 Affidavit of Timothy B. Wolford
("First Wolford Aff.") [Dkt. 107-1]; March 7, 2014 Order Authorizing the Interception of Wire
and Electronic Communications ("First Wiretap Order") [Dkt. 107-2]; April 24, 2014 Affidavit
of Timothy B. Wolford ("Second Wolford Aff.") [Dkt. 107-3]; April 24, 2014 Order Authorizing
the Interception of Wire and Electronic Communications ("Second Wiretap Order") [Dkt. 107-

## I. FACTUAL BACKGROUND

In early 2013, the Federal Bureau of Investigation ("FBI") and the Washington, D.C. Metropolitan Police Department ("MPD") began an investigation into narcotics trafficking in and around the Woodbury Village apartment complex in southeast Washington, D.C.  First Wolford Aff. ¶ 20.  Over the course of the investigation, the FBI and the MPD identified a narcotics trafficking organization involved in distributing phencyclidine ("PCP") in that area known as the "23rd Street Crew."  Id. ¶¶ 21-22.  The FBI and the MPD, relying on information obtained from executing three search warrants and from a confidential source who had conducted three controlled purchases of narcotics from defendant Levon Simmons (at least one purchase was of PCP), concluded that Simmons was distributing PCP in Woodbury Village.  Id. ¶ 22.

On March 7, 2014, the FBI submitted an application and proposed order for a 30-day wiretap on Simmons's cell phone.  First Wolford Aff. ¶ 4.  The application was supported

---

4]; Government's Omnibus Opposition to Defendant Fenwick's Motions ("Opp.") [Dkt. 108]; Defendant Simmons's First Motion to Adopt [Dkt. 113]; Defendant Ford's Motion to Dismiss Count One Due to Outrageous Conduct or to Suppress Wiretap Evidence ("Ford Mot.") [Dkt. 121]; Defendant Sanders' Motion to Suppress Electronic Surveillance ("Sanders Mot.") [Dkt. 127]; Defendant Simmons's Motion to Suppress Statements and Physical Evidence ("Simmons Mot.") [Dkt. 128]; Defendant Simmons's Second Motion to Adopt [Dkt. 129]; Government's Omnibus Opposition to Defendants' Motions ("Second Opp.") [Dkt. 137]; Defendant Grant's Motion to Adopt [Dkt. 145]; Defendant Ford's Reply to Government's Omnibus Opposition to Defendants' Motion to Dismiss Count One Due to Outrageous Conduct or to Suppress Wiretap Evidence ("Ford Reply") [Dkt. 153]; Defendant Fenwick's Notice of Adopted Motions [Dkt. 157]; Defendant Hager's Motion to Joint [sic] and Adopt Motions [Dkt. 158]; Defendant Sanders Motion to Adopt [Dkt. 159]; Defendant Leach's Motion to Join and Adopt [Dkt. 165]; Defendant Ford's Notice of Expert [Dkt. 178]; Transcript of December 11, 2015 Motions Hearing ("12/11/15 Tr.") [Dkt. 181]; Defendant Ford's Motion for Extension of Time [Dkt. 199]; Affidavit of Ben Levitan ("Levitan Aff.") [Dkt. 208-1]; Government's Supplemental Opposition to Defendant Ford's Motion to Dismiss [Dkt. 211]; Defendant Ford's Reply to Government's Supplemental Opposition [Dkt. 219]; Government's Sur Reply to Defendant Ford's Motion to Dismiss [Dkt. 226]; and Defendant Ford's Reply to Government's Sur Reply [Dkt. 228].

by the affidavit of FBI Special Agent Timothy B. Wolford, which detailed, inter alia, law enforcement's probable cause to believe that Simmons was involved in PCP trafficking, id. ¶¶ 24-50, and an explanation of why a wiretap was necessary to bring all of the members of the 23rd Street Crew and not just Simmons to justice. Id. ¶¶ 51-80. Agent Wolford's affidavit did not identify as "target subjects" any of the defendants in this case except for Simmons. Id. ¶¶ 11-18. Judge Reggie B. Walton reviewed the application and affidavit, and signed the wiretap order, finding both probable cause and necessity. First Wiretap Order.

On April 24, 2014, the FBI submitted a second application supported by a second affidavit of Agent Wolford and proposed order, for a 30-day extension of the wiretap on Simmons's cell phone. Second Wolford Aff. This time, the FBI detailed the evidence that it had obtained from the first wiretap as support for probable cause and necessity. Second Wolford Aff. ¶¶ 17-26. Agent Wolford's second affidavit identified defendants Ford, Sanders, Hager, Fenwick, and Grant as additional "target subjects," id. ¶ 12(b), (c), (d), (h), & (l), and cited interceptions involving each one of them as a basis for probable cause. Id. ¶¶ 17-26. Judge Walton signed the order extending the wiretap, finding again that Agent Wolford's affidavit amply demonstrated probable cause and necessity. Second Wiretap Order.

Based on evidence obtained from the controlled purchases and Simmons's many phone calls overheard on the wiretaps, the grand jury returned an indictment charging all seven defendants with one count of participating in a conspiracy to distribute PCP, in violation of 21 U.S.C. § 846. Accord Superseding Indictment at 1-4 (changing the drug quantity alleged for one defendant in Count One, the conspiracy count, but not adding or subtracting counts). Based on additional physical evidence law enforcement obtained while executing arrest warrants, the indictment also charges Simmons, Fenwick, and Leach with one or more counts of possession

with intent to distribute PCP ("PWID PCP"), in violation of 21 U.S.C. § 841(a)(1); charges

Simmons and Fenwick with one count each of using a firearm in furtherance of a drug trafficking

crime, in violation of 18 U.S.C. § 924(c)(1); and charges Simmons with one count of felon in

possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Id. at 4-6.

      Defendants challenge the wiretap evidence on three primary grounds: (1) Agent

Wolford's affidavits fail to demonstrate necessity under 18 U.S.C. § 2518(1)(c); (2) the FBI and

the MPD failed to minimize wiretap interceptions; and (3) Agent Wolford's affidavits contain

reckless false statements or material omissions, entitling defendants to a hearing under Franks v.

Delaware, 438 U.S. 154 (1978) ("Franks hearing"). The defendants suggest that, if any of these

challenges is meritorious, the Court must suppress all "fruits" of the wiretap evidence, such as

statements or physical evidence that the government obtained when executing arrest warrants for

which the wiretap evidence provided probable cause. See Ford Mot. at 8; Sanders Mot. at 2;

Simmons Mot. 2.[3] After discussing some of the background principles underlying the federal

wiretap statute, the Court will address each of these challenges in turn.

## II.  DISCUSSION

### A.  *Statutory Background*

      Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No.

90-351, 82 Stat. 197, 211-25 (codified as amended at 18 U.S.C. §§ 2510 et seq.), established the

detailed procedures for the interception of wire, oral, or electronic communications. Among

---

[3]    Simmons's motion argues only that, if the Court suppresses the wiretap evidence, the Court must also suppress physical evidence and statements as "fruit of the poisonous tree." See Simmons Mot. at 2. The Court previously reserved deciding this issue. See United States v. Ford, No. 15-cr-0025, 2016 WL 362370, at *2 (D.D.C. Jan. 28, 2016). Grant, Hager, and Leach join Simmons's motion, Dkt. 145, 158 & 165, but it is moot as to Grant and Leach because they have entered pleas of guilty. See United States v. Ramirez, 54 F. Supp. 2d 25, 27 (D.D.C. 1999) (motions filed by defendants who "entered guilty pleas . . . therefore became moot").

other requirements, the statute requires that the government's affidavit in support of the wiretap application must contain an explanation of the facts and circumstances that the officer applying for the wiretap believes justify the wiretap and a statement explaining the necessity of the wiretap to the government's investigation.  18 U.S.C. § 2518(1)(b)-(c).  Before issuing the wiretap order, a judge must determine that the wiretap is necessary for the investigation and that there exists probable cause to believe that the target phone is or soon will be used in connection with particular enumerated criminal offenses.  18 U.S.C. § 2518(3)(c)-(d).  Title III requires that the court order authorizing the wiretap specify the nature and location of the communications facilities to be wiretapped and contain a provision mandating that law enforcement minimize the interception of communications that fall outside the scope of the wiretap order.  18 U.S.C. §§ 2518(4)(b), 2518(5).

Normal Fourth Amendment search and seizure principles and "the judicially fashioned exclusionary rule" developed by the case law do not describe the outer bounds of the legitimacy of a wiretap.  See United States v. Scurry, No. 12-3104, 2016 WL 1391995, at *8 (D.C. Cir. Apr. 8, 2016) (quoting United States v. Giordano, 416 U.S. 505, 524 (1974)).  Title III is more restrictive than the Fourth Amendment; it contains "its own exclusionary mandate."  Id. at *3.  The statute provides:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of [Title III].

18 U.S.C. § 2515.

A defendant seeking to exclude wiretap evidence under this section "must have Title III 'standing,' which Title III defines as '[a]ny aggrieved person in any trial, hearing, or proceeding,' 18 U.S.C. § 2518(10)(a), who was a target of the wiretap or a person party to a wiretap intercept, id. § 2510(11)." United States v. Scurry, 2016 WL 1391995, at *3.  Any "aggrieved person . . . may move to suppress" wiretap evidence and its fruits "on the grounds that (i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a)(i)-(iii); see also United States v. Brodie, 742 F.3d 1058, 1062-63 (D.C. Cir. 2014).[4]  But "[s]uppression [of the wiretap evidence] is required only when the government fails to comply with 'those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.'" United States v. Scurry, 2016 WL 1391995, at *8 (quoting United States v. Giordano, 416 U.S. at 527).  Those statutory requirements that "directly and substantially implement" the intent of Congress — at least so far as are relevant here — include necessity, probable cause, and minimization.  "Consequently, not every failure to comply with Title III will warrant suppression under section 2518(10)(a)(i)." Id.

In this case, defendants do not claim that the wiretap orders are facially insufficient.  Rather, their arguments fall within the first and third statutory grounds for

---

[4]    The government does not challenge defendants' standing as "aggrieved persons" in this case, nor could it.  While Grant, Hager, and Sanders were "a party" to only some interceptions and therefore have standing to suppress only those interceptions, see 18 U.S.C. § 2510(11), Simmons was "a party" to every interception and therefore has standing to suppress the wiretap evidence in total.  See Bill of Particulars at 3-70 (listing Simmons as a party to each of the interceptions among the 624 over arts).

suppression.  Defendants' arguments that Agent Wolford's affidavit (1) failed to demonstrate necessity under 18 U.S.C. § 2518(1)(c) and (2) contained reckless falsehoods or material omissions that entitle defendants to a <u>Franks</u> hearing both fall within 18 U.S.C. § 2510(a)(i) as allegations that "the communication was unlawfully intercepted."  Their argument that the FBI and the MPD failed to minimize recordings under 18 U.S.C. § 2518(5) falls within 18 U.S.C. § 2510(a)(iii) as an allegation that "the interception was not made in conformity with the [wiretap] order."  The Court addresses the necessity and minimization arguments first before turning to probable cause and the request for a <u>Franks</u> hearing.

### B. Necessity

Title III's necessity requirement demands that the government's affidavit in support of a wiretap include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  The necessity requirement applies equally to applications to extend a wiretap for additional 30-day periods.  18 U.S.C. § 2518(5); <u>see also</u> 18 U.S.C. § 2518(3).

Defendants contend that Agent Wolford's affidavits lack a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'"  Ford Mot. at 9 (quoting 18 U.S.C. § 2518(1)(c)); <u>see also</u> Fenwick Mot. at 1-9; Sanders Mot. at 3-4.[5]  On defendants' view, Agent Wolford's affidavits contained "boilerplate" recitations of what "would

---

[5]    Fenwick's motion makes only the necessity argument.  It is moot as to him, Leach, and Grant because they have all entered pleas of guilty.  See <u>United States v. Ramirez</u>, 54 F. Supp. 2d at 27.  The Court still considers the arguments raised in Fenwick's motion, however, because Simmons, Hager, and Sanders adopted it.  See Dkt. 113, 145, 158 & 159.

be true in most narcotics investigations" and failed to show that law enforcement had "exhausted all other possible investigative techniques before seeking approval" of a wiretap. Ford Mot. at 10. They propose a number of investigative methods short of a wiretap that they allege could have achieved the same results: (1) confidential sources and undercover officers, (2) controlled purchases; (3) physical surveillance or searches; (4) flipping cooperating witnesses from an earlier prosecution; (5) grand jury subpoenas; and (6) pen registers. Ford Mot. at 9-14; Ford Reply at 20-23.

        In assessing necessity, courts will "reject[] generalized and conclusory statements that other investigative procedures would prove unsuccessful." United States v. Williams, 580 F.2d 578, 588 (D.C. Cir. 1978). "Although intended to prevent over-reliance on wiretapping authority, Title III's necessity requirement 'was not designed to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted.'" United States v. Scurry, 2016 WL 1391995, at *13 (quoting United States v. Carter, 449 F.3d 1287, 1293 (D.C. Cir. 2006)). "[T]he government will meet its burden of demonstrating necessity if it shows that other techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation." United States v. Carter, 449 F.3d at 1293.

        "In the conspiracy context, the necessity requirement 'is satisfied when traditional investigative techniques have proved inadequate to reveal the operation's full nature and scope,'" United States v. Scurry, 2016 WL 1391995, at *13 (quoting United States v. Glover, 681 F.3d 411, 420 (D.C. Cir. 2012)), or "the government tried to gather information about the defendant in other ways." United States v. Glover, 583 F. Supp. 2d 21, 36-37 (D.D.C. 2008). In United States v. Scurry, the D.C. Circuit explained that it "has repeatedly upheld necessity

determinations" in drug conspiracy cases where the affidavit in support of the wiretap detailed the investigative steps that law enforcement took and why those steps "failed to disclose the full nature and scope of the narcotics-trafficking enterprise." 2016 WL 1391995, at *13; see also United States v. Carter, 449 F.3d at 1293-94 (affidavit describing only physical surveillance met necessity requirement because it contained a detailed explanation of why other investigative techniques "would be inadequate to reveal the 'full nature and scope' of the drug conspiracy"); United States v. Sobamowo, 892 F.2d 90, 93 (D.C. Cir. 1989) (affidavit describing undercover work, records examination, and physical surveillance in drug conspiracy investigation met necessity requirement because "the government . . . was not required to enumerate every technique or opportunity missed or overlooked").

Here, Agent Wolford's first and second affidavits enumerate every technique that defendants charge that the government should have pursued and amply demonstrate that the wiretaps were necessary by explaining why each of defendants' proffered alternative investigative methods would be either ineffective or unsafe. Opp. at 14-23.

1.   Confidential Sources, Undercover Officers, and Controlled Purchases

In his first affidavit, Agent Wolford stated that the further use of confidential sources, undercover officers, and controlled purchases "would not . . . result in a successful prosecution of all members" of the conspiracy because "narcotics distributors . . . do not reveal their source of supply to customers for fear of being cut out of future drug sales," "[n]or do [they] reveal their stash locations to customers for fear of having their drugs or proceeds stolen, or the location being given to law enforcement officers." First Wolford Aff. ¶¶ 55, 67. Agent Wolford explained that law enforcement's best confidential source in this case, "CS #1" was "not in a position to deal directly with SIMMONS' suppliers," and "[t]o task CS #1 to inquire as

to the identity of SIMMONS' source of PCP supply would arouse suspicion and potentially place CS #1 in danger." Id. ¶ 56. Agent Wolford also identified a unique limitation on further use of CS #1 in this investigation: "the suspected PCP from the 2nd controlled narcotics purchase did not test positive at the DEA laboratory.  This indicated that SIMMONS sold CS #1 fake PCP. To attempt another controlled purchase from SIMMONS with CS#1 would arouse SIMMONS' suspicion that CS #1 was working with law enforcement." Id.  He further explained that "[a]nother serious obstacle" to using cooperating sources or informants is that the narcotics distribution business is "stratified," meaning Simmons does not "deal with [his] customer's customers" in order to prevent "his customers [from] cut[ting] him, the 'middle man,' out of the deal." Id. ¶ 58.  Confidential sources, undercover officers, and controlled purchased therefore could not yield information about "other purchasers, sources of supply, shipment of drugs, stash locations, and methods of operation used by SIMMONS and his organization." Id.

Agent Wolford affirmed that the limitations of confidential sources, undercover officers, and controlled purchases continued to exist in April 2014 at the time of his affidavit in support of the second order authorizing wiretap interceptions.  Second Wolford Aff. ¶¶ 30-31. He explained that the wiretap interceptions "indicate[d] that SIMMONS deals with the same customers he has known and trusts, or individuals who are referred (or sponsored) to him from very close and reliable individuals," and that "agents have been unable to conduct [additional] controlled purchases from SIMMONS." Id. ¶ 31.

## 2.    Physical Surveillance or Searches

In his first affidavit, Agent Wolford stated that physical surveillance cannot succeed in isolation because it "leaves the investigators with insufficient evidence to prove the purpose of the meetings or other activity" that they observe.  First Wolford Aff. ¶ 60.  Agent

Wolford also explained that Simmons and his associates are "extremely cautious and aware of law enforcement surveillance," particularly "vehicles [that] do not belong in their neighborhood." Id. ¶ 62. When law enforcement conducted controlled purchases from Simmons, Simmons chose a "location [that] can only be accessed on foot and is shielded from observation." Id. ¶ 63. Agent Wolford therefore hypothesized that "extensive physical surveillance could very well compromise the secrecy of the investigation." Id. ¶ 64. He also explained, however, that when "physical surveillance is used in conjunction" with wiretapping, "the purpose of meetings takes on a new significance and may constitute admissible, persuasive evidence of criminal activity." Id. ¶ 61. As one such example of the efficacy of combining wiretap interception and physical surveillance in this case, Agent Wolford's second affidavit stated that law enforcement recorded a conversation wherein Simmons agreed to meet his PCP supplier and gave his "exact location." Second Wolford Aff. ¶¶ 33-34. Law enforcement agents therefore "were able to pre-position themselves at the prescribed location and observed a" vehicle registered to and driven by Ford "arrive at the location" to meet Simmons. Id. ¶ 34.

As for physical searches, Agent Wolford concedes that several searches of Simmons's alleged "stash houses" in early 2013 resulted in the seizure of eight firearms, eight ounces of PCP, and the indictment of six of Simmons's co-conspirators. First Wolford Aff. ¶ 21. Agent Wolford explained, however, that additional searches require predicate information like "the immediate whereabouts of the sought-after evidence." Id. ¶ 58. Even if law enforcement could pinpoint a stash house, a physical search would "cause SIMMONS and those higher in the organization to simply change their methods of distribution in order to further evade law enforcement," id. ¶ 59, or, worse, "take action against law enforcement if detected." Second Wolford Aff. ¶ 38. Agent Wolford affirmed that "search warrants would not be effective at

achieving the larger goals of this investigation," i.e., "[e]vidence seized likely would only

implicate some individuals and not the entire organization." First Wolford Aff. ¶ 68.  Indeed,

Agent Wolford's second affidavit describes how a search warrant, the basis for which was

wiretap evidence, failed because the subjects of the warrant were "alerted about the officers and

agents approach to the building and [were] able to exit the area with contraband before the agents

arrived at the apartment to execute the warrant." Second Wolford Aff. ¶¶ 41-42.

 3. Cooperating Witnesses, Grand Jury Proceedings, and Pen Registers

 Agent Wolford averred in his first affidavit that attempting to get cooperating

witnesses from an earlier criminal prosecution or to hold grand jury proceedings would

undoubtedly "alert" Simmons and the other targets of the investigation and lead to the

"destruction or concealment of documents and other evidence." First Wolford Aff. ¶¶ 70, 72.

The "five subjects associated with SIMMONS' drug organization" who already had been

arrested were unwilling to cooperate, which "demonstrate[s] the loyalty of SIMMONS' crew to

the organization." Id. ¶ 70. Further, a grand jury proceeding was unlikely to produce reliable

evidence because the witnesses "would most likely invoke their Fifth Amendment privilege,"

and, if not, "would likely lie under oath." Id. ¶ 71. To provide any grand jury witness immunity

would also be "unwise" because it might risk "foreclose[ing] prosecution of the most culpable

persons in the conspiracy. Id.

 Pen registers were used in the early stages of this investigation in order to

determine what phone numbers Simmons was calling and whether those numbers were in contact

with known drug dealers. First Wolford Aff. ¶ 46(b). Agent Wolford explained, however, that

pen registers can only "provide agents with a list of numbers called and will not establish the

identities of all the persons participating in the call or the context of the conversations." Id. ¶ 78.

12

While pen registers "provide data on the frequency of calls and identifying information regarding calls from a particular phone," they ultimately were unhelpful in this investigation because "narcotic traffickers often subscribe to telephones in fictitious names." Id.

The Court is satisfied that these explanations sufficiently demonstrate why non-wiretap methods could not "reveal [Simmons's] operation's full nature and scope." See United States v. Glover, 681 F.3d at 420. Law enforcement attempted to use pen registers, confidential informants, and physical surveillance in this case prior to concluding that a wiretap was necessary, which is more than the D.C. Circuit required in United States v. Carter, 449 F.3d at 1293-94, where it found that law enforcement needed only conduct physical surveillance to satisfy the necessity requirement. Even if Agent Wolford's affidavits did not "enumerate every technique or opportunity missed or overlooked," see United States v. Sobamowo, 892 F.2d at 93, they explained why each one of the alternative techniques defendants suggest "would prove unsuccessful." See United States v. Williams, 580 F.2d at 588. The Court therefore will deny defendants' motion to suppress the wiretap evidence on the grounds that the government failed to satisfy the necessity requirement of 18 U.S.C. § 2518(1)(c).

## C. Minimization

Defendants next argue that Title III requires law enforcement to "conduct[] [the wiretap interception] in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5); see Sanders Mot. at 3.[6] Title III's minimization requirement "turns on whether the government made 'reasonable efforts to

---

[6]     Grant, Fenwick, Hager, and Leach adopt Sanders's motion, see Dkt. 145, 157, 158 & 165, but it is moot as to Grant, Fenwick, and Leach because they all now have entered pleas of guilty. See United States v. Ramirez, 54 F. Supp. 2d at 27.

minimize interceptions of non-pertinent communications." United States v. Scurry, 2016 WL 1391995, at *14 (quoting United States v. Carter, 449 F.3d at 1295).  The burden is initially on the defendant to "identify particular conversations so that the government can explain their non-minimization." United States v. Carter, 449 F.3d at 1295.  "To challenge the reasonableness of the government's minimization efforts, a party must present more than the raw number of non-pertinent intercepted calls and their durations." United States v. Scurry, 2016 WL 1391995, at *14 (citing United States v. Cano-Flores, 796 F.3d 83, 87-88 (D.C. Cir. 2015)).  Moreover, "the fact that the investigation of a target is part of a larger investigation of 'a widespread conspiracy' and the fact that the target and his co-conspirators communicate in code language are circumstances that would justify 'more extensive surveillance' by the government." United States v. Carter, 449 F.3d at 1296 (quoting Scott v. United States, 436 U.S. 128, 140 (1978)).

Here, defendants' briefing on the minimization argument consists of two sentences in Sanders's motion to suppress: "[n]one of the calls in which Sanders was intercepted were incriminating.  As such, they all should have been minimized." See Sanders Mot. at 3. Hager joins Sanders's motion, see supra note 6, but does not attempt to identify any recordings that the government should have minimized and thus fails to carry his burden.  Sanders's counsel elaborated on his minimization argument during the motions hearing, stating that United States v. Carter is distinguishable because Sanders has "specifically identified" the calls that should have been minimized. 12/11/15 Tr. at 131.  Sanders's counsel then listed several calls in which Sanders refers to "his dog," the "blickey," "bust[ing] a move," "grabb[ing] that can," and other alleged code words for firearms or PCP that he argues are "not incriminatory" because those "statement[s] could have a number of interpretations." 12/11/15 Tr. at 129-31.

14

Sanders's minimization argument lacks merit because the government has explained the non-minimization of each conversation Sanders's counsel identified at the motions hearing. Each contains what the government alleges — and says it will prove at trial — to be code words for firearms or PCP that defendants understood. While the government will need to offer expert testimony to prove that claim at trial, see United States v. Glover, 681 F.3d 411, 422 (D.C. Cir. 2012), the Supreme Court and the D.C. Circuit agree that minimization is relaxed in the context of wiretaps containing "code language" in a "widespread conspiracy" prosecution. See Scott v. United States, 436 U.S. at 140; United States v. Carter, 449 F.3d at 1296. The Court therefore will deny defendants' motion to suppress the wiretap evidence on the grounds that the government failed to satisfy the minimization requirement in 18 U.S.C. § 2518(5).

### D. Defendants' Entitlement to a *Franks* Hearing

Defendants next assert that there are five reckless false statements or material omissions in Agent Wolford's affidavits that they maintain entitle them to a Franks hearing: (1) he omitted the fact that law enforcement conducted a controlled purchase on October 10, 2013 that involved Simmons, see Ford Reply at 8-10; (2) he omitted the fact that a cooperating witness had previously provided untrue information to the government, see id. at 11-12; (3) he falsely alleged that Simmons was participating in a conspiracy when the only co-conspirators Agent Wolford identifies in his affidavit were in jail or were confidential government sources, see Ford Mot. at 8-9; Ford Reply at 5-7, 12-16; (4) he relied upon controlled purchases occurring in October 2013 that had gone stale by the time of his affidavits in March and April 2014, see Ford Mot. at 7-8; Ford Reply at 17 & n.14; and (5) he committed "outrageous" conduct by "omitting the fact . . . that the FBI had already initiated and conducted wiretap intercepts on a

cell phone allegedly used by Ford for which there was no Justice Department application or court approved authorization." See Ford Mot. at 2-3; see also Ford Reply at 2-5.[7]

The third and fourth bases are actually challenges to the probable cause contained in Agent Wolford's affidavits; neither argument alleges that Agent Wolford's affidavits contain false statements or omissions. The Court therefore will analyze them separately from defendants' other bases for a Franks hearing.

## 1. Challenges to Probable Cause

Title III's probable cause requirement stems from the statute's dual demands that: (1) the government's affidavit provide "a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued," 18 U.S.C. § 2518(1)(b); and (2) the authorizing judge determine that "there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person." 18 U.S.C. § 2518(3)(d).[8]

---

[7]     Ford docketed his motion to suppress wiretap evidence [Dkt. 124] separately from his motion to dismiss the conspiracy count based on "outrageous" conduct [Dkt. 121]; docket number 124 has no attached memorandum of law, however, and docket number 121 makes arguments in favor of both motions. Each of the other defendants joins Ford's motions, see Dkt. 129 (Simmons), 145 (Grant), 157 (Fenwick), 158 (Hager), 159 (Sanders), & 165 (Leach), but Ford's motions are moot as to Grant, Fenwick, and Leach because they all now have entered pleas of guilty. See United States v. Ramirez, 54 F. Supp. 2d at 27.

[8]     A motion to suppress wiretap evidence based on a violation of these probable cause provisions of Title III is an argument that "the communication was unlawfully intercepted" under 18 U.S.C. § 2510(a)(i), not that "the [wiretap] order . . . is insufficient on its face" under 18 U.S.C. § 2510(a)(ii). See United States v. Donovan, 429 U.S. 413, 432 (1977) ("There is no basis on the facts of this case to suggest that the authorization orders are facially insufficient . . . . Thus, only § 2518(10)(a)(i) is relevant:  Were the communications 'unlawfully intercepted' given the violation[] of § 2518(1)(b)(iv)[?]").

"Title III imports the Fourth Amendment's probable cause standard:  the authorizing court must 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before it, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place,'" United States v. Scurry, 2016 WL 1391995, at *12 (quoting United States v. Eiland, 738 F.3d at 338, 347 (D.C. Cir. 2013)), or, more precisely, that there was "a 'fair probability' that the target phone was being and would be used to commit the specified narcotics offenses." Id. The Court must restrict its probable cause inquiry to the four corners of the law enforcement agent's affidavit. United States v. Johnson, 332 F. Supp. 2d 35, 39 (D.D.C. 2004). "Even if the affidavit does contain some general language, applications are not to be read in a piecemeal fashion." United States v. Eiland, 738 F.3d at 347 (internal quotation marks omitted).

### a.  Probable Cause of a Conspiracy

Defendants' argument that Agent Wolford first affidavit falsely alleged that Simmons had co-conspirators is without merit. At least two circumstances set forth in Agent Wolford's first affidavit provided a substantial basis to believe that wiretap interception of Simmons's phone would reveal evidence of a conspiracy to distribute PCP. First, while it is "an "established proposition that a government agent cannot be a conspirator," see United States v. Sitzmann, 74 F. Supp. 3d 96, 105 (D.D.C. 2014) (citing United States v. Iennaco, 893 F.2d 394, 397 n.3 (D.C .Cir. 1990)), Agent Wolford's first affidavit describes how a "black male later identified as ANTHONY DAVIS" — admittedly not a government agent — was present when the government's confidential source conducted a controlled purchase of PCP from Simmons on October 28, 2013, for which the confidential source recorded both audio and video.  First

Wolford Aff. ¶¶ 38, 40. Ford responds that Davis was incarcerated at the time of this purchase for a District of Columbia felony conviction. See Ford Reply at 8 (citing 2013-CF3-21997 (D.C. Sup. Ct.)). The District of Columbia Superior Court docket reveals, however, that Davis did not enter custody until December 16, 2013 for that offense, nearly six weeks later than the date of the controlled purchase.

Second, Agent Wolford's first affidavit mentions that law enforcement executed a search warrant in early 2013 for "crew members that worked with SIMMONS to operate stash houses" and obtained a cellphone with "[t]ext messages . . . corroborat[ing] that [six] individuals . . . were conspiring to control the sale of narcotics in their territory." First Wolford Aff. ¶ 21. A reliable government confidential source identified those six persons "as crew members that worked with SIMMONS to operate stash houses." Id. "Taken as a whole, then, [Agent Wolford's] affidavit satisfies Title III's probable cause requirement." See United States v. Scurry, 2016 WL 1391995, at *12 (citing 18 U.S.C. § 2518(1)(b), (3)(d)).[9]

### b. Staleness

Defendants' staleness challenge to the probable cause for the first wiretap also lacks merit.[10] "Because probable cause must exist at the time that law enforcement applies for a warrant, the freshness of the supporting evidence is critical." United States v. Washington, 775 F.3d 405, 408 (D.C. Cir. 2014). "The likelihood that the evidence sought is still in place is a

---

[9]     Because the Court finds that Agent Wolford's first affidavit established probable cause to believe that Simmons was engaged in a conspiracy to distribute PCP, it does not consider the government's alternative argument that Agent Wolford's affidavits needed only to establish probable cause of PWID PCP. See Second Opp. at 5-6.

[10]     Defendants do not challenge the probable cause for the second affidavit, because Agent Wolford's second affidavit (dated April 24, 201) detailed as support for probable cause the evidence that the FBI had just obtained from the first wiretap (which operated for 30 days beginning on March 7, 2014). Second Wolford Aff. ¶¶ 17-26.

function not simply of watch and calendar but of variables that do not punch a clock: the

character of the crime (chance encounter in the night or regenerating conspiracy?), of the

criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or

of enduring utility to its holder?), of the place to be searched (mere criminal forum of

convenience or secure operational base?), etc." United States v. Matthews, 753 F.3d 1321, 1325

(D.C. Cir. 2014) (quoting United States v. Bruner, 657 F.2d 1278, 1298 (D.C. Cir. 1981)

(quotation marks and citation omitted)). "Courts have sometimes been more 'lenient' in

evaluating the freshness of evidence in extended conspiracies than for single-incident crimes."

United States v. Washington, 775 F.3d at 408 (quoting United States v. Webb, 255 F.3d 890, 905

(D.C. Cir. 2001)).

   The way in which freshness of information is analyzed in the unique context of

wiretap orders is somewhat different because the question is not probable cause to believe that

drugs, guns, or other contraband is still located at a particular place, but probable cause to

believe that the content of telephone calls will yield evidence of criminal activity. Decisions in

drug conspiracy cases nationwide assessing whether information in a wiretap affidavit has gone

stale typically focus on whether the affidavit as a whole demonstrates that the owner of the target

phone is engaged in ongoing drug trafficking. See, e.g., United States v. Iiland, 254 F.3d 1264,

1269 (10th Cir. 2001) (finding probable cause for wiretap based on three-month-old evidence

where "the affidavit also contains facts demonstrating that the alleged drug trafficking activity

was ongoing"); United States v. Diaz, 176 F.3d 52, 109-10 (2d Cir. 1999) (finding probable

cause for wiretap because, "to the extent that there are acts of past criminal activity that in and of

themselves might be stale, such acts can be sufficient if an affidavit also establishes a pattern of

continuing criminal activity so there is reason to believe that the cited activity was probably not a

19

one-time occurrence") (internal quotation marks omitted); United States v. Tallman, 952 F.2d 164, 166 (8th Cir. 1991) ("Notwithstanding this [four month] delay, [] we conclude that the on-going nature of the conspiracy was sufficiently established by the affidavit to support the finding that probable cause existed for the issuance of the wiretap authorization."); United States v. Rowell, 903 F.2d 899, 903 (2d Cir. 1990) ("Given the continuous nature of narcotics conspiracies . . . , the approximately 18-month delay between procuring the informants' statements and seeking the wiretap warrant did not render the information stale.").

Here, the evidence that Agent Wolford proffered in his first affidavit on March 7, 2014 "demonstrates that there was a 'fair probability' that the target phone was being and would be used to commit the specified narcotics offenses." See United States v. Scurry, 2016 WL 1391995, at *12 (internal quotation marks omitted). Agent Wolford explained that, beginning in early October 2013, the government obtained an order authorizing the use of a pen register on Simmons's prior cell phone. First Wolford Aff. ¶¶ 44-48. Later that month, the government's confidential source communicated with Simmons via text messages and telephone calls to and from that prior cell phone before conducting two controlled purchases from Simmons on October 16, 2013, id. ¶¶ 32-35, and October 28, 2013. Id. ¶¶ 38-42. The pen register revealed that "[b]etween October 11, 2013, and December 6, 2013" Simmons exchanged 17,352 text messages and 6,379 telephone calls, id. ¶ 45, including 16 calls with a person "identified by an MPD cooperating source [] as a member of the 23rd [S]treet [C]rew, who has sold PCP in the crew's territory." Id. ¶ 46(b). Agent Wolford also observed that, "[b]ased upon [his] training and experience[,] this high call volume is consistent with phone use for the purpose of narcotics trafficking." Id. ¶ 45.

In January 2014, the government obtained a second order authorizing the use of a pen register on Simmons's new cell phone, the target phone for the instant wiretap orders.  First Wolford Aff. ¶ 49; see also id. ¶ 48 (explaining that a reliable confidential source confirmed that Simmons was using the new cell phone).  The pen register again revealed a "high call volume" of 13,382 text messages and 9,092 calls between January 24, 2014 and February 25, 2014, id. ¶ 49, but this time indicated only that Simmons communicated several times with a person who "is a suspect in two armed robberies" and "has a criminal history."  Id. ¶ 50.

There is no doubt that law enforcement's October 2013 controlled purchases of PCP from Simmons would have provided them with the probable cause necessary for a wiretap application at that time.  The question here is whether the October 2013 controlled purchases became stale by the time of Agent Wolford's first affidavit in March 2014 and, if so, whether the more recent pen register data provides the necessary freshness to create a "fair probability" that evidence of PCP distribution would be found by wiretapping calls made from Simmons's cell phone beginning in March 2014.  Judge Walton's order authorizing the first wiretap does not indicate what evidence he relied on to find probable cause.  See First Wiretap Order.  But two pieces of evidence situate the present case among those wiretap drug conspiracy cases from other circuits, see supra at 19-20, that reject staleness challenges to probable cause based on the fact that the owner of the target phone is engaged in ongoing drug trafficking:  (1) between October 2013 and December 2014, Simmons communicated actively with a person law enforcement knew, on the basis of a reliable confidential source, to be a PCP dealer, First Wolford Aff. ¶ 46(b); and (2) in October 2013, Simmons used his cell phone to call and send text messages to the government's confidential source in order to facilitate his sale of PCP to the source.  Id. ¶¶ 32-35.  In reviewing the wiretap applications and Agent Wolford's first affidavit, Judge

Walton was entitled to credit the government's reliable confidential source for the proposition

that Simmons was actively communicating with known PCP dealers as recently as three months

before the government sought the wiretap. Cf. United States v. Savoy, 889 F. Supp. 2d 78, 89

(D.D.C. 2012) (collecting D.C. Circuit staleness cases in the context of probable cause to search

for physical evidence that approve of reliance on information as old as five months). Likewise,

the confidential source's text messages and telephone calls with Simmons's prior cell phone in

order to facilitate the controlled purchases of PCP supplied a fair probability that Simmons was

using the target phone to conduct drug trafficking.[11]  The Court therefore concludes that the

evidence supporting probable cause in Agent Wolford's first affidavit was not stale.

## 2. Omissions

The court next addresses two alleged omissions in Agent Wolford's affidavits that

the defendants argue entitle them to a Franks hearing:  (1) that he omitted the fact that law

enforcement conducted a controlled purchase on October 10, 2013 that involved Simmons, see

Ford Reply at 8-10; and (2) that he omitted the fact that a cooperating witness had provided

untrue information in the past. See id. at 11-12.  In order to support an entitlement to a Franks

hearing, a defendant must make a substantial preliminary showing that "'(1) the affidavit

contained false statements or omitted certain facts; (2) the [false] statements [or omitted facts]

were material to the issue of probable cause; and (3) the false statements [or omissions] were

made knowingly and intentionally, or with reckless disregard for the truth.'" United States v.

Becton, 601 F.3d 588, 594 (D.C. Cir. 2010)) (quoting United States v. Richardson, 861 F.2d 291,

---

[11]      Judge Walton was also entitled to credit Agent Wolford's conclusion that, based
on his experience, the extremely high volume of phone calls and text messages on Simmons's
prior phone and the target phone were indicative of drug trafficking. See First Wolford Aff.
¶¶ 45, 49.

293 (D.C. Cir. 1988) (per curiam)).  Upon making this showing — which must be "more than conclusory" and "accompanied by an offer of proof," Franks v. Delaware, 438 U.S. at 171 — "the Fourth Amendment requires that a hearing be held."  Id. at 156.

Defendants' argument that Agent Wolford omitted the October 10, 2013 controlled purchase from his affidavit fails prong two (the materiality prong) because — as the Court just determined, see supra at § II(D)(1)(a)-(b) — Agent Wolford's first affidavit established probable cause even in the absence of the October 10, 2013 controlled purchase. Under prong two, false statements are only material if, "set to one side, the affidavit's remaining content is insufficient to establish probable cause," Franks v. Delaware, 438 U.S. at 156, or, by corollary, omitted statements are material if "their inclusion in the affidavit would defeat probable cause.'"  United States v. Spencer, 530 F.3d 1003, 1007 (D.C. Cir. 2008) (internal quotation marks omitted).  Because including the October 10, 2013 controlled purchase would only strengthen the probable cause in Agent Wolford's affidavit, his decision to omit it is cannot be grounds for a Franks hearing.

Defendants' second argument, that Agent Wolford omitted the fact that a cooperating witness had provided untrue information, fails prong one because there was no such omission.  Agent Wolford testified at the motions hearing that the confidential source "who had that statement providing one-time false information was not used in the first two affidavits, and we didn't have his information at the time that I wrote that -- the initial wiretap affidavit."  Tr. 12-11-15 at 73.  Defendants do not dispute this testimony.  Because there was no omission, this issue does not provide a basis for a Franks hearing.

### 3. Outrageous Government Conduct

Defendants' fifth alleged basis for a <u>Franks</u> hearing is "outrageous" government conduct, namely that law enforcement had an extrajudicial wiretap on Ford's cell phone. <u>See</u> Ford Mot. at 2-6; Ford Reply at 2-5. Ford alleged in his motion that he had — at that time — "consulted with a wiretap expert who would testify" that the "audible ringing" heard on several wiretap recordings is proof of such an extrajudicial wiretap. Ford Mot. at 5. At the motions hearing, the Court stated that Ford's allegation was a "serious" one, the resolution of which required "an expert report or an expert affidavit" to resolve whether incoming calls to a target phone include an audible "ringing" before a call to the target phone is answered. 12/11/15 Tr. at 30, 33. Ford noticed its expert, <u>see</u> Dkt. 178, and propounded six discovery requests concerning wiretap information on the government in order to aid its expert. <u>See</u> Dkt. 199 ¶ 4. Eventually, Ford narrowed his request to two discrete sets of information about the wiretaps: (1) pen register data and (2) monitor notes. <u>See</u> Levitan Aff. ¶ 12. The government complied with Ford's request to provide that information. <u>Id.</u>

Ford's expert ultimately reached no conclusion about the "audible ringing" issue. In fact, the expert entirely refutes the position that Ford took in his motion by stating that a "recording must start before the two parties are connected" and, "[a]s such, . . . ringing [] which may occur prior to a call being answered is recorded." Levitan Aff. ¶ 11. The expert's only conclusion is that, "[w]ithout full and proper discovery if [sic] cannot be determined if the wiretaps in this matter were performed via the J-STD-025 CALEA wiretap system of the target's carrier and a complete analysis cannot be properly performed." <u>Id.</u> ¶ 13. Ford therefore has no evidence that an "audible ringing" on the wiretap recordings is indicative of an extrajudicial wiretap, and this argument provides no basis for a <u>Franks</u> hearing.

The Court notes that Ford's "audible ringing" argument has transformed over the course of the briefing that followed the filing of his expert's affidavit. Ford's expert identified three problems with the wiretap discovery the defense received from the government: (1) pen register data is missing for five calls; (2) one recording demonstrates "clipping," i.e., "the audio recordings started late"; and (3) the government modified the pen register data from its original form. Levitan Aff. ¶¶ 10-12. Ford filed a subsequent memorandum of law arguing that these problems provide two additional bases to suppress the wiretap evidence in this case: (1) the "clipping" suggests the recording was "derived from a separate unauthorized wiretap"; and (2) "MPD has wiretap equipment" named a "Sting Ray" that "can perform wiretaps without a court order." See Dkt. 219 at 2-3. Indeed, Ford contends, "the legitimacy or illegitimacy of the wiretap does not depend solely on the 'audible ringing' issue." Id.

These new bases for suppression are waived because Ford raised them for the first time in his reply brief. See In re Asemani, 455 F.3d 296, 300 (D.C. Cir. 2006) (finding argument "waived because it was made for the first time in his reply brief"); Rollins Envtl. Servs. v. EPA, 937 F.2d 649, 653 n.2 (D.C. Cir. 1991) ("Issues may not be raised for the first time in a reply brief."). In any event, they lack merit. Ford's expert explained that the allegedly "clipped" call was a call from Simmons's target cell phone to Ford and therefore was recorded pursuant to the authorized wiretap. See Levitan Aff. ¶ 11 ("The [allegedly clipped] call is apparently from the target phone to Mr. Ford's phone. . . . [T]his is an outgoing call from the target."). Likewise, defendants present absolutely no evidence that law enforcement used a String Ray in this case, or that doing so would violate either Title III or the Fourth Amendment. The court therefore finds no basis to hold a Franks hearing because of "outrageous" government conduct.

The government also asks the Court to "strike any allegations that" Agent Wolford "misled the Court regarding any unauthorized wiretaps," Dkt. 211 at 7 n.3, but the Court declines to do so because it is sufficient that this Opinion rejects defendants' allegations in their entirety.

## III.  CONCLUSION

For the foregoing reasons, the Court denies defendants' motions to suppress the wiretap evidence.  An Order consistent with this Opinion shall issue this same day.

SO ORDERED.



PAUL L. FRIEDMAN
United States District Judge

DATE: 4/26/16